# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| 615 S. Kenmore Ave., Apartment 104, Los Angeles, CA 90005, as described more fully in Attachment A-2 | )  Case No. 2:21-MJ-05241 ) ) ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g) | Felon in Possession of a Firearm(s)/Ammunition |
| 18 U.S.C. § 924(c) | Possession of a Firearm in Furtherance of a Drug Trafficking Crime or Crime of Violence |
| 18 U.S.C. § 922(a)(1)(A) | Dealing Firearms without a License |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Andrew J. Roosa*
_____
*Applicant's signature*

Andrew J. Roosa, Special Agent, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

Alicia G. Rosenberg, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Amy E. Pomerantz (x0730)

**ATTACHMENT A-2**

PREMISES TO BE SEARCHED

The premises to be searched is the property located at Kenmore Towers, 615 S Kenmore Avenue, Apt. 104, Los Angeles, CA 90005 ("SUBJECT PREMISES 2"). SUBJECT PREMISES 2 sits within a four (4) story, multi-family residential apartment building with approximately fifty-nine (59) units.  The complex has a dark grey roof with red brick trim around the windows and along the bottom of the apartment building.  The exterior walls of the building are a light grey stucco.  Once you enter the elevator and go from the lobby of the apartment building to the floor one (1), directions to SUBJECT PREMISES 2 are exiting the elevator south and walking to the right west side, then proceed to make another right walking northbound on the first floor. Once at the end of the hallway make a left turn walking westward on the floor passing two units and through a doorway in the middle of the hall, to arrive at SUBJECT PREMISES 2 which is to the right, north side of the hall with the number "1" affixed to the door of the unit.

## ATTACHMENT A-2 CONTINUED

 



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

55.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 922(g) and 924(c) (firearms offenses), 18 U.S.C. § 922(a)(1)(A) (dealing in firearms without a license), 18 U.S.C. § 371 (conspiracy), and 18 U.S.C. § 2 (aiding and abetting) (the "Target Offenses"), namely:

a.   Firearms or ammunition;

b.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

d.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, CashApp, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

v

      e.    Records, documents, programs, applications, materials, or conversations relating to the sale or purchase of guns or ammunition, including correspondence, receipts, records, and documents noting prices or times when guns or ammunition were bought, sold, or otherwise distributed;

      f.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of guns or ammunition;

      g.    Contents of any calendar or date book;

      h.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

      a.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

      b.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

      i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security
software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

        vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

        viii.    records of or information about
Internet Protocol addresses used by the device;

        ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    56.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

57.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

58.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime

was encountered, including how it was immediately apparent
contraband or evidence of a crime.

       d.   If the search determines that a digital device
does not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the device and delete or destroy all forensic copies thereof.

       e.   If the search determines that a digital device
does contain data falling within the list of items to be seized,
the government may make and retain copies of such data, and may
access such data at any time.

       f.   If the search determines that a digital device is
(1) itself an item to be seized and/or (2) contains data falling
within the list of other items to be seized, the government may
retain the digital device and any forensic copies of the digital
device, but may not access data falling outside the scope of the
other items to be seized (after the time for searching the
device has expired) absent further court order.

       g.   The government may also retain a digital device
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

       h.   After the completion of the search of the digital
devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

59.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

60.  The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel

assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

61.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Andrew Roosa, being duly sworn, declare and state as follows:

## I.  **PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of an application for a warrant to search the premises of New Leaf Clothing and Kicks, 828 S. Vermont Ave., Los Angeles, CA 90005 ("SUBJECT PREMISES 1"), as described more fully in Attachment A-1, and the premises of 615 S. Kenmore Ave., Apartment 104, Los Angeles, CA 90005 ("SUBJECT PREMISES 2") (collectively, the "SUBJECT PREMISES"), as described more fully in Attachment A-2, for evidence, fruits and instrumentalities of violations of 18 U.S.C. §§ 922(g) and 924(c) (firearms offenses), 18 U.S.C. § 922(a)(1)(A) (dealing in firearms without a license), 18 U.S.C. § 371 (conspiracy), and 18 U.S.C. § 2 (aiding and abetting) (the "Target Offenses"), as described further in Attachment B.

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth the entirety of my knowledge of the investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

1

## II. <u>BACKGROUND OF AFFIANT</u>

3.   I am a law enforcement officer of the United States,
within the meaning of Title 18, United States Code, Section
2510(7), and I am empowered by law to conduct investigations of,
and to make arrests for, the offenses enumerated in Title 18,
United States Code, Section 2516.  I am a Special Agent ("SA")
of the Federal Bureau of Investigation ("FBI") and have been so
since September 2018.  I am currently assigned to a Criminal
Enterprise Squad at the Los Angeles Field Office of the FBI,
where I am tasked with investigating violent gangs, as well as
narcotics trafficking, money laundering, and other offenses in
conjunction with the Los Angeles Metropolitan Task Force on
Violent Gangs ("LAMTFVG"), a multi-agency federal, state, and
local gang task force.  Since March 2019, I have primarily been
working on investigations targeting violent street gangs
involved in the possession with intent to distribute and
distribution of controlled substances, as well as conspiracy to
do the same, in violation of 21 U.S.C. §§ 841(a)(1), and 846,
and firearms offenses in violation of 18 U.S.C. §§ 922(g) and
924(c).

4.   I received basic law enforcement training at the Basic
Field Training Course at the FBI Academy in Quantico, Virginia
from September 2018 to February 2019.  This training included
segments on conducting criminal investigations, narcotics
identification, organized crime, gangs, and other law
enforcement topics.  My experience as an SA with the FBI
includes, but is not limited to, conducting physical

2

surveillance, executing search and arrest warrants, working with
informants, the issuance of subpoenas, the analysis of pen
register and trap and trace records, interviewing subjects and
witnesses, consensually monitored meetings and telephone calls,
and conducting court-authorized interception of wire
communications.  I have received training in the investigation
of violations of federal law, including federal drug conspiracy
laws, and have personally participated in and assisted with
several gang investigations involving the organized distribution
of illegal narcotics.  Additionally, I have also become familiar
with the methods used by drug traffickers to avoid detection by
law enforcement, including use of cellular telephones that are
subscribed in the names of other persons, prepaid cellular
telephones, counter-surveillance techniques, coded and ambiguous
language, use of multiple vehicles without license plates, and
false identities.  I have become familiar with the methods,
language, structures, and criminal activities of street gangs
and transnational gangs operating within and outside of this
judicial district.

    5.   Prior to becoming an SA with the FBI, I was a Staff
Operations Specialist with the FBI for approximately four years.
As a Staff Operations Specialist, I was tasked with performing
toll analysis, reporting intelligence to the United States
Intelligence Community, and building inter-agency partnerships
on targets of National Security investigations.  I was also a
member of the FBI's Hazardous Evidence Response Team for two
years.  As a member of this team, I was tasked with collecting

evidence for both criminal and National Security investigations and providing hazardous materials operational support, in collaboration with Fire and EMS Departments, on a Rapid Detection Team during multiple events designated as National Special Security Events.

6. During the course of my career, I have personally interviewed gang members while working on criminal enterprise investigations. I have experience in debriefing cooperators, witnesses, confidential human sources ("CHSs"), and defendants who had personal knowledge regarding organized crime, criminal street gang activity, major narcotics trafficking organizations, and other criminal offenses, including violent crimes. Through these efforts, I have become familiar with the methods used by gang members and narcotics traffickers. Specifically, I have become knowledgeable about the investigative techniques that are useful and viable in certain situations and those that are not. I have also consulted with other investigators who have extensive training and experience in criminal enterprise and financial investigations. I have executed search warrants for organized crime, gang, and narcotics investigations, seeking evidence of crimes committed by members of organizations, as well as evidence of trafficking of controlled substances, weapons violations, gang indicia, and violent crimes.

7. In my current assignment with the LAMTFVG, I work with FBI SAs and federally deputized state law enforcement officers from the Los Angeles Police Department ("LAPD"), the Los Angeles Sheriff's Department ("LASD"), the California Department of

4

Corrections and Rehabilitation ("CDCR"), and several other
agencies.  I am the lead case agent for the investigation
targeting the subjects of this affidavit.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

15.  The FBI is investigating PHUOC KIEN HUYNH, also known
as ("aka") "Mike" ("HUYNH"), and FIRST NAME UNKNOWN ("FNU") LAST
NAME UKNOWN ("LNU") for the distribution of firearms to members
and associates of the Rollin 60's Neighborhood Crips ("Rollin
60's") street gang.  Beginning in or around September 2021, the
FBI used a confidential informant to purchase firearms from
HUYNH and/or FNU LNU, HUYNH's associate.  Following the
controlled buys, the FBI obtained a GPS location warrant for
HUYNH's cellular device.

16.  On September 30, 2021, the FBI conducted a controlled
purchase of a firearm from HUYNH at SUBJECT PREMISES 1.  On
November 4, 2021, the FBI conducted a controlled purchase of two
firearms from FNU LNU at SUBJECT PREMISES 2.  FNU LNU
immediately delivered the proceeds from that transaction to
HUYNH at SUBJECT PREMISES 1.

17.  The FBI conducted controlled purchases of firearms on
three separate occasions from FNU LNU outside of SUBJECT
PREMISES 2.  Immediately before a controlled firearms purchase
on November 10, 2021, LAMTFVG personnel saw FNU LNU exit the
apartment unit located at SUBJECT PREMISES 2, holding a white
bag with a revolver.  LAMTFVG personnel then saw FNU LNU deliver
that same bag to a confidential informant outside of SUBJECT
PREMISES 2.

5

18.   Based on surveillance of the SUBJECT PREMISES 1 and SUBJECT PREMISES 2, review of GPS location data, and observations made during the controlled buys, as detailed below, there is probable cause to believe that evidence of the Target Offenses will be located at SUBJECT PREMISES 1 and SUBJECT PREMISES 2.

IV. **STATEMENT OF PROBABLE CAUSE**

19.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

A.   **Summary and Background of Investigation**

20.   The Rollin 60's is a criminal street gang that operates in South Central Los Angeles and has associated cliques throughout the United States.  The Rollin 60's engages in narcotics distribution, firearm sales, and other acts of violence.  In January 2021, the FBI began using a confidential human source ("CHS") to assist in the investigation of Rollin 60's members and associates.[1]

---

[1] The CHS is a paid informant who has worked with the FBI since January 2021.  The CHS is also cooperating in order to possibly receive an early termination of probation from the Los Angeles County Probation Department for providing information to the FBI.  Based on my training and experience, I believe that the CHS is reliable.  I believe this because the CHS has provided information related to the Rollin 60's narcotics and firearms trafficking that has been independently corroborated by the LAMTFVG through arrests, surveillance, and laboratory reports. The CHS's statements about the commission of the Target Offenses by HUYNH and FNU LNU has also been corroborated through my video/audio review of the buys that CHS did with them.  The CHS has one felony conviction for Attempted Burglary.

21.   From September 2021 to November 2021, acting at the direction of the LAMTFVG, the CHS conducted four controlled purchases of firearms from HUYNH and FNU LNU, HUYNH's associate. The CHS identified HUYNH from his California Department of Motor Vehicle ("DMV") photograph.  Both SUBJECT PREMISES 1 and SUBECT PREMISES 2 were used by the Targets in connection with the controlled firearm buys.  For instance, as detailed below, on one occasion FNU LNU left SUBJECT PREMISES 2 to deliver proceeds of a firearms transaction to HUYNH at SUBJECT PREMISES 1.  On three other occasions, HUYNH arranged for the CHS to purchase firearms from FNU LNU at SUBJECT PREMISES 2. On one occasion, HUYNH directed the CHS to purchase a firearm from him inside of SUBJECT PREMISES 1.

   B.   **Examples of Controlled Firearms Purchases Involving SUBJECT PREMISES 1 and SUBJECT PREMISES 2**

HUYNH Directs the CHS to Purchase a Rifle at SUBJECT PREMISES 2

22.   On or about September 22, 2021, the CHS conducted a controlled purchase of a rifle and ammunition from FNU LNU at SUBJECT PREMISES 2.  I reviewed reports dated September 23, 2021 and October 4, 2021 detailing the transaction and reviewed a copy of a video of the purchase.  Prior to the controlled purchase, I searched the CHS for contraband, which was met with negative results.  At approximately 2:46 p.m., at my direction, the CHS placed a consensually monitored telephone call to (626) 476-5085 (the "5085 phone"), used by HUYNH.  I reviewed a transcript of the call and the recorded conversation was as follows:

7

**HUYNH:** Yo

**CHS:** Aye Mike, aye I'm on my way to come pick it up.

**HUYNH:** Alright

**CHS:** Aye um to make sure I'm correct, aye make sure, it's $1400 right? Because I'm counting my shit right now.

**HUYNH:** Yeah $1400. I'm going to text you the address right now. I had to move it out of my storage. It's at my other spot. It's down the street at the shop though.

**CHS:** Alright look. I'm 5 minutes away. So can you send it right now please?

**HUYNH:** Yeah, Imma send it to you right now. What's it called. Um, it's loaded ok?

**CHS:** Alright bet.

23.   Based on my training and experience, I believe HUYNH was directing the CHS to purchase an assault rifle at SUBJECT PREMISES 2, instead of SUBJECT PREMISES 1.  When HUYNH says "I'm going to text you the address right now. I had to move it out of my storage. It's at my other spot", I believe HUYNH was telling the CHS that he uses SUBJECT PREMISES 2 as a secondary stash location for his firearms, in addition to SUBJECT PREMISES 1.

24.   Immediately after the call, I outfitted the CHS with an audio and video recorder, gave him/her cash funds for the controlled purchase, and gave him/her an overhear device so that LAMTFVG members and I could monitor the CHS's activities.  TFO Cliff Jones subsequently drove the CHS to SUBJECT PREMISES 2, while the rest of the LAMTFVG and I initiated surveillance. When TFO Jones arrived outside of SUBJECT PREMISES 2 with the

8

CHS, TFO Dennis Jarrott saw FNU LNU exit the entryway for
SUBJECT PREMISES 2.  TFO Jones saw FNU LNU and the CHS greet
each other and, at approximately 3:09 p.m., saw the CHS give FNU
LNU money for the rifle.  At approximately 3:10 p.m., TFO
Jarrott saw FNU LNU return inside of the entryway to SUBJECT
PREMISES 2.

25.  From approximately 3:11 p.m. until 3:21 p.m., TFO
Jones drove the CHS to the debrief location.  At approximately
3:23 p.m., FBI SA Dezmond Beverly and I collected the rifle and
the ammunition from the CHS.  At approximately 3:25 p.m., I
deactivated the recording equipment.  SA Hernandez Orantes and I
then met the CHS and searched him/her for contraband, which was
met with negative results.  The CHS told us that HUYNH was a
firearms suppliers for multiple Crip gangs in Los Angeles,
including the Rollin 60's.  The CHS told us HUYNH had called
him/her earlier that day, inquiring if he/she wanted to purchase
an assault rifle for $1,400.  Initially, HUYNH told the CHS to
purchase the rifle from his sneaker store, SUBJECT PREMISES 1,
but changed his mind and told the CHS to pick up the rifle from
one of his employees at SUBJECT PREMISES 2.  When the CHS
arrived at SUBJECT PREMISES 2, he/she called HUYNH, who told the
CHS that his employee would arrive downstairs shortly with the
rifle.  The CHS told us FNU LNU greeted him/her and gave the CHS
the rifle with one magazine of ammunition.

26.  Following the controlled purchase, the CHS placed a
consensually monitored telephone call to HUYNH at the 5085

number.  I reviewed a transcript of the call and the recorded conversation was as follows:

**CHS:** Hello? Aye my bad, aye you think. You think you can get something like either today or tomorrow? Like shit

**HUYNH:** For sure for tomorrow. I'll have, I'll have… Hit me tomorrow morning.

**CHS:** Tomorrow morning. Alright, because I'm lowkey in some shit right now. That's why I keep calling bugging. I'm calling around and shit.

**HUYNH:** (Unintelligible) It's good, I got you.

**CHS:** Alright, aye? So I'll meet you at the store and if you can get something?

**HUYNH:** Yep

**CHS:** Alright

**HUYNH:** My boy, he. My boy, he got um. He got one with a switch, but he wants. It's a Glock with a switch

**CHS:** Alright, what he want for that? Ah shit, I'll grab it

**HUYNH:** $2500 though

**CHS:** He want $2500 for a Glock with a switch on it?

**HUYNH:** Yep

**CHS:** Shit, alright. Um, Shit. If that's my last option, I'll either grab something from him but if you come up with something tomorrow morning, then I'm coming straight to you. You already know

**HUYNH:** Alright, bet.

27.  Based on my training and experience, I believe this conversation is about firearms distribution at SUBJECT PREMISES

10

1.  When HUYNH says "My boy, he got um. He got one with a switch, but he wants. It's a Glock with a switch", I believe he is telling the CHS that he can get the CHS a fully automatic pistol.  When HUYNH says "yep" after CHS asked if he/she should meet HUYNH at "the store", I believe HUYNH is telling CHS that he/she could purchase a fully automatic pistol from him at SUBJECT PREMISES 1 the following day.

28.  I also reviewed a copy of the video of the transaction, where I saw FNU LNU meet with the CHS at TFO Jones' vehicle.  I saw FNU LNU carrying a blue IKEA bag in the video. I also spoke to TFO Jones following the buy.  TFO Jones told me that the assault rifle was in the blue IKEA bag that FNU LNU was carrying.

CHS Purchases Pistol from HUYNH at SUBJECT PREMISES 1

29.  On or about September 30, 2021, the CHS conducted a controlled purchase of a pistol and ammunition from HUYNH at SUBJECT PREMISES 1.  I reviewed reports dated October 1, 2021 and October 4, 2021 detailing the transaction and reviewed a copy of a video of the purchase.  Prior to the controlled purchase, TFO Ricardo Cardona searched the CHS for contraband, in my presence, which was met with negative results.  TFO Cardona and I drove the CHS to the vicinity of SUBJECT PREMISES 1.  Prior to the CHS leaving the vehicle at approximately 12:34 p.m., I outfitted the CHS with an audio and video recorder, gave him/her cash funds for the controlled purchase, and gave him/her an overhear device so that LAMTFVG members and I could monitor the CHS's activities.  At approximately 12:36 p.m., SA Beverly,

11

TFO Cardona, and I saw the CHS enter SUBJECT PREMISES 1.  At that same time, we heard the CHS discussing firearms with HUYNH on the overhear device.  At approximately 12:38 p.m., TFO Cardona and I picked up the CHS and collected the pistol and ammunition from the CHS.  I then deactivated the recording equipment while TFO Cardona and I drove the CHS to the debrief location.

30.  When we arrived to the debrief location at approximately 12:45 p.m., TFO Cardona searched the CHS for contraband, in my presence, which was met with negative results. SA Beverly, TFO Cardona, and I then met the CHS.  The CHS told us that HUYNH contacted him/her earlier that day inquiring if he/she wanted to purchase a pistol for $1,200 at SUBJECT PREMISES 1.  When the CHS arrived at SUBJECT PREMISES 1 later that day, he/she knocked on the door.  The CHS told us that, seconds later, HUYNH greeted the CHS at the door and gave him/her a pistol with one magazine of ammunition while inside SUBJECT PREMISES 1.  The CHS gave HUYNH $1,200 for the pistol and ammunition.  The CHS also saw multiple other individuals inside the store.

31.  Following the transaction, I reviewed a copy of the video, where I saw HUYNH meet the CHS inside of SUBJECT PREMISES 1.  I saw HUYNH give the CHS a pistol on the video and saw the CHS give HUYNH cash funds.

CHS Purchases Rifle and Pistol at SUBJECT PREMISES 2, FNU LNU
Delivers Proceeds of Transaction to HUYNH at SUBJECT PREMISES 1

32.  On or about November 4, 2021, the CHS conducted a
controlled purchase of a rifle, pistol, and ammunition from FNU
LNU at SUBJECT PREMISES 2.  FNU LNU delivered the proceeds from
that transaction to HUYNH at SUBJECT PREMISES 1 immediately
after the transaction.  I reviewed reports dated November 5,
2021 and November 8, 2021 detailing the transaction and reviewed
a copy of a video of the purchase.  Prior to the controlled
purchase, TFO Cardona searched the CHS for contraband, in my
presence, which was met with negative results.  At approximately
12:39 p.m., at my direction, the CHS placed a consensually
monitored telephone call to the 5085 phone, used by HUYNH.  I
reviewed a transcript of the call and the recorded conversation
was as follows:

**CHS:** Aye. Aye Mike, my bad. Aye, I'm 5 minutes away. But I have
to ask, aye, do I need to get a duffle bag? Or a bag from the
store real quick?

**HUYNH:** It's, it's already in a duffle bag.

**CHS:** Alright, so you, he going to meet me downstairs right now?

**HUYNH:** Yep yep. When you outside, he going to run down.

**CHS:** Alright bet. Um, I'm 5 minutes away.

**HUYNH:** Alright, bet

33.  Based on my training and experience, I believe this
conversation is about firearms distribution.  When HUYNH says
"it's already in the duffle bag", I believe he is telling the
CHS that the firearms the CHS will purchase are stored in a
duffle bag.  When HUYNH then says "when you outside, he going to
run down", I believe he is telling the CHS that FNU LNU will

13

meet the CHS outside of SUBJECT PREMISES 2, instead of inside SUBJECT PREMISES 2, with that duffle bag for the CHS.

34.  Immediately after the call, TFO Cardona and I drove the CHS to the vicinity of SUBJECT PREMISES 2.  Prior to the CHS leaving the vehicle at approximately 12:58 p.m., I outfitted the CHS with an audio and video recorder, gave him/her cash funds for the controlled purchase, and gave him/her an overhear device so that LAMTFVG members and I could monitor the CHS's activities.  At approximately 1:00 p.m., TFO Cardona saw the CHS arrive to SUBJECT PREMISES 2.  At approximately 1:01 p.m., TFO Cardona and I heard, via the overhear device, the CHS place a call to HUYNH at the 5085 number to let HUYNH know that he/she arrived to SUBJECT PREMISES 2.  At approximately 1:02 p.m., SA Beverly saw FNU LNU exit the entryway of SUBJECT PREMISES 2 and give the CHS a black duffel bag in exchange for cash funds. Following the transaction, SA Beverly and TFO Hernandez saw FNU LNU standing next to a batter-powered scooter in the vicinity of Kenmore Avenue and Wilshire Boulevard.  While FNU LNU was operating the scooter, TFO Jarrott picked up the CHS at approximately 1:07 p.m.

35.  While TFO Jarrott was driving the CHS to the debrief location, TFO Cardona and I followed FNU LNU, who was riding the scooter.  At approximately 1:08 p.m., TFO Cardona and I saw FNU LNU riding the scooter southbound on Vermont Avenue and cross 8th Street.  At approximately 1:11 p.m., TFO Cardona and I saw FNU LNU stop the scooter directly in front of SUBJECT PREMISES 1. HUYNH was standing outside of SUBJECT PREMISES 1.  When FNU LNU

14

arrived, he gave HUYNH a bundle of cash funds.  HUYNH placed the
cash funds inside of a fanny pack.  FNU LNU then immediately
departed and rode the scooter northbound on Vermont Ave.

36.  I know from my training and experience that
individuals who engage in contraband trafficking, such as
firearms, will often maintain secondary stash houses at
locations separate from where they store their main supply.
This is especially the case when they have a legitimate
distributor or customer, such as a sneaker distributor or
customer, visiting the location where they keep their source of
supply.  Firearms traffickers do this in order to protect their
proceeds and stash in case their supply location is robbed by a
distributor or customer.  I believe HUYNH also uses FNU LNU's
residence, SUBJECT PREMISES 2, as a secondary stash location for
firearms.  As detailed above, HUYNH maintains firearms at
SUBJECT PREMISES 1.  SUBJECT PREMISES 1 is a business frequented
by sneaker customers and resellers, as set forth in Section IV
Part C.  Here, I believe HUYNH understands he cannot reasonably
always store firearms at SUBJECT PREMISES 1.  As such, FNU LNU
is a money counter and reporting the amount of proceeds from
firearms sales that he is storing at SUBJECT PREMISES 2 for
HUYNH.

37.  While TFO Cardona and I were driving to meet TFO
Jarrott and the CHS at the debrief location, several other
LAMTFVG members continued surveillance of FNU LNU.  At
approximately 1:14 p.m., TFO Kevan Beard saw FNU LNU return on
the scooter to SUBJECT PREMISES 2.  From approximately 1:15 p.m.

15

until 1:18 p.m., TFO Hernandez conducted surveillance of FNU LNU
inside the lobby and elevator of SUBJECT PREMISES 2.  TFO
Hernandez saw FNU LNU walk into the lobby of SUBJECT PREMISES 2
and enter the elevator.  While FNU LNU was on the elevator, TFO
Hernandez saw him press the elevator button for floor 1.  TFO
Hernandez saw FNU LNU exit the elevator at floor 1 and walk in
the direction of Apartment 104, which was later identified as an
apartment FNU LNU has access to on November 10, 2021.

        38.  At approximately 1:16 p.m., TFO Cardona and I met the
CHS and TFO Jarrott at the debrief location.  At approximately
1:17 p.m., TFO Jarrott and I collected the rifle, pistol, and
ammunition from the CHS.  I then deactivated the recording
equipment.  At approximately 1:21 p.m., I searched the CHS for
contraband, in the presence of TFO Cardona, which was met with
negative results.  TFO Cardona and I then met the CHS.  The CHS
told us that HUYNH contacted him/her the day before inquiring if
he/she wanted to purchase more firearms and to meet him the
following day.  Following the CHS's consensually monitored
telephone call with HUYNH, where HUYNH directed the CHS to pick
up the firearms at SUBJECT PREMISES 2, the CHS called HUYNH
again when he arrived.  The CHS recounted that HUYNH told the
CHS to wait for FNU LNU and meet him/her outside of SUBJECT
PREMISES 2.  Shortly thereafter, FNU LNU walked outside of
SUBJECT PREMISES 2 and gave the CHS a pistol for $1,000 and a
rifle for $1,400.  The CHS told us that, after the transaction,
FNU LNU walked back inside of the entryway to SUBJECT PREMISES
2, then quickly exited and found a battery-powered scooter.

Following the transaction, I reviewed a copy of the video, where I saw FNU LNU meet with the CHS outside of SUBJECT PREMISES 2.

HUYNH Directs CHS to Purchase a Revolver from FNU LNU at SUBJECT PREMISES 2

39.   On or about November 10, 2021, the CHS conducted a controlled purchase of a revolver from FNU LNU at SUBJECT PREMISES 2.   I reviewed reports dated November 10, 2021 detailing the transaction and reviewed a copy of a video of the purchase.   Prior to the controlled purchase, I searched the CHS for contraband, in TFO Cardona's presence, which was met with negative results.   At approximately 12:46 p.m., at my direction, the CHS placed a consensually monitored telephone call to the 5085 phone, used by HUYNH, which TFO Cardona and I heard. During the call, HUYNH directed the CHS to pick up a revolver at SUBJECT PREMISES 2 for $700.

40.   TFO Cardona and I drove the CHS to the vicinity of SUBJECT PREMISES 2 approximately one hour later.   While we were driving the CHS to SUBJECT PREMISES 2, at approximately 1:51 p.m., we saw HUYNH standing at the threshold of SUBJECT PREMISES 1.   When TFO Cardona and I arrived at SUBJECT PREMISES 2 with the CHS minutes later, I outfitted the CHS with an audio and video recorder, gave him/her cash funds for the controlled purchase, and gave him/her an overhear device so that LAMTFVG members and I could monitor the CHS's activities.   At approximately 2:01 p.m., TFO Cardona and I dropped off the CHS in the vicinity of SUBJECT PREMISES 2.   At approximately 2:03 p.m., TFO Hernandez saw the CHS walk in and out of the lobby of

17

SUBJECT PREMISES 2, where the CHS waited for approximately 15 minutes.

41.   At approximately 2:18 p.m., while the CHS was waiting for FNU LNU, SA Beverly and TFO Jarrott saw FNU LNU exit Apartment 104.  FNU LNU was the same individual who SA Beverly saw give the CHS a duffel bag containing a rifle and pistol on November 4, 2021.  FNU LNU was walking a dog and was holding a white shopping bag.  Seconds later, SA Beverly and TFO Jarrott saw FNU LNU get on the elevator.  At approximately 2:20 p.m., TFO Beard and TFO Hernandez saw FNU LNU exit the lobby of SUBJECT PREMISES 2 and greet the CHS.  TFO Beard and TFO Hernandez saw FNU LNU walking the same dog and give the CHS the same white bag SA Beverly and TFO Jarrott saw outside of Apartment 104.

42.   At approximately 2:25 p.m., TFO Cardona and I picked up the CHS and collected the revolver from the CHS.  I then deactivated the recording equipment while TFO Cardona and I drove the CHS to the debrief location.  When TFO Cardona and I arrived to the debrief location with the CHS, I searched the CHS for contraband, in the presence of TFO Cardona, which was met with negative results.  TFO Cardona and I then met the CHS.  The CHS told us that HUYNH directed the CHS to purchase a revolver from FNU LNU at SUBJECT PREMISES 2 for $700.  Following the CHS's consensually monitored telephone call with HUYNH, the CHS went to SUBJECT PREMISES 2 and waited for FNU LNU.  After several minutes, FNU LNU came outside the lobby of SUBJECT PREMISES 2 and gave the CHS a white bag containing a revolver.

The CHS told us that he/she gave FNU LNU $700 in exchange for the revolver.

43.  As described above, I viewed the recordings depicting the controlled firearm purchases on September 22, 2021, September 30, 2021, and November 4, 2021.  Due to the November 11, 2021 federal holiday, FBI Electronic Surveillance Technicians have not yet had an opportunity to download the video recording of the November 10, 2021 transaction.

C.  **Investigation of SUBJECT PREMISES 1 and 2**

44.  On October 8, 2021, the Honorable James Dabney of the Superior Court for the State of California signed an order authorizing disclosure of GPS location data for the cellular device registered to HUYNH.  I reviewed data obtained from the warrant and learned that HUYNH's cellular device was consistently located in the vicinity of SUBJECT PREMISES 1 at various hours on weekdays from approximately 11:00 a.m. until 6:00 p.m.

45.  On October 7, 2021, TFO Hernandez and I conducted surveillance of SUBJECT PREMISES 1 from approximately 3:07 p.m. until 5:43 p.m.  During surveillance, I saw HUYNH walk in and out of SUBJECT PREMISES 1 and conduct multiple sneaker sales at the threshold of the business.

46.  On October 13, 2021, TFO Cardona and TFO Jarrott conducted surveillance of SUBJECT PREMISES 1.  At approximately 10:49 a.m., TFO Cardona saw HUYNH arrive to SUBJECT PREMISES 1. HUYNH proceeded to open the rolled-down gate and unlock SUBJECT PREMISES 1.  At approximately 10:51 a.m., TFO Cardona saw HUYNH

19

enter SUBJECT PREMISES 1.  As discussed in Section IV Part B, on or about November 4, 2021, the LAMTFVG conducted surveillance of SUBJECT PREMISES 1 and observed FNU LNU deliver the proceeds a firearms transaction to HUYNH, who was conducting sneaker sales at the threshold of SUBJECT PREMISES 1.  As discussed in Section IV Part B, on or about November 10, 2021, TFO Cardona and I saw HUYNH standing outside of SUBJECT PREMISES 1 prior to the controlled firearms purchase with FNU LNU.

47.  As discussed above in Section IV Part B, the LAMTFVG conducted surveillance inside and outside of the apartment building containing SUBJECT PREMISES 2 on September 22, 2021, November 4, 2021, and November 10, 2021.  On each of these occasions, the LAMTFVG saw FNU LNU either exiting the apartment building lobby or exiting his specific apartment unit.

## V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

48.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

49.  Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other

20

individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

50.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

51.  Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

52.  Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]</u>

53.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices

been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

     c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

     d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

///

///

## VII. <u>CONCLUSION</u>

54.  For all the reasons described above, there is probable cause to believe that the items to be seized, as described in Attachment B, will be found in a search of SUBJECT PREMISES 1 and SUBJECT PREMISES 2, as described in Attachment A-1 and Attachment A-2.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 16th day of
November, 2021.


_____
HONORABLE ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE

25